UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Application of

TRAFIGURA PTE LTD

For an Order Pursuant to 28 U.S.C. § 1782
To Conduct Discovery for Use in a Foreign
Proceeding

No. 25 Misc. __41_____

# DECLARATION OF HUMPREET KAUR GRIGORIADIS

HUMPREET KAUR GRIGORIADIS declares as follows pursuant to 28 U.S.C. § 1746:

1. I am a partner in the law firm Stephenson Harwood LLP, based in London, England. I am a member of Stephenson Harwood's fraud and asset recovery team and advise clients in asset tracing and recovery matters that often span across multiple jurisdictions. I submit this declaration in support of the application of Trafigura Pte Ltd for an order pursuant to 28 U.S.C. § 1782 to conduct discovery for use in a foreign proceeding.

## The *Trafigura* Litigation in the London High Court

2. I represent Trafigura Pte Ltd in connection with proceedings captioned *Trafigura Pte Ltd v. Prateek Gupta et al.*, Claim No. CL-2023-000054, that are currently pending before the High Court of Justice, Business and Property Courts of England and Wales, Commercial Court, in London, England. I also represent Trafigura Pte Ltd's Indian trading affiliate Trafigura India Pvt Ltd, which is the Second Claimant in those proceedings. References in this Declaration to "Trafigura" include both entities as the context requires.

3. Trafigura is a leading global commodity trading company incorporated in Singapore that specialises in the oil and gas, minerals and metals, power and carbon trading, and

1

renewable energy markets. The *Trafigura* litigation in the English court arises out of a scheme to defraud Trafigura by selling containers that were represented to contain nickel but in fact contained other, substantially less valuable materials. The defendants are the businessman Mr. Prateek Gupta (a Dominican citizen who was, until August 2018, an Indian national) and seven entities which Trafigura contends he is affiliated with (collectively referred to as the "Sellers", and together with Mr. Gupta, the "Defendants"). Of the Sellers, Mr. Gupta accepts that he is a de facto or legal controller of UIL (Singapore) Pte. Ltd., UIL Malaysia Ltd., TMT Metals AG, ZUG and TMT Metals (UK) Ltd, but denies that he is the de facto or legal controller of Spring Metal Limited, Mine Craft Limited, and New Alloys Trading Pte. Ltd.

4. A true and correct copy of Trafigura's Claim Form in the English litigation, dated 8 February 2023, is attached as **Exhibit A**. A true and correct copy of Trafigura's Particulars of Claim, served on May 3, 2023, is attached as **Exhibit B**. In the following paragraphs, I summarise Trafigura's allegations as set forth in those pleadings.

5. By a series of contracts entered into between October 2021 and August 2022 (referred to in the Particulars of Claim as the "Master Contracts"), Trafigura agreed to purchase and one of the Sellers agreed to sell Trafigura specified quantities of high-quality nickel. During negotiations for each Master Contract, the Sellers represented to Trafigura that they intended honestly to perform their obligations to deliver nickel as specified in the contracts.

6. In the Master Contracts, the parties agreed that the individual sales and purchases of nickel would be effected by separate shipments of agreed quantities of nickel (referred to in the Particulars of Claim as the "Cargoes") in one or more shipping containers. Between 23 September 2021 and 4 July 2022, the parties agreed to and performed about 86 such trades. As of November 2022, a number of further trades were in process (referred to in the Particulars of Claim as the "Disputed Trades"), specifically: (i) 100 further trades for which Trafigura agreed

to resell the nickel back to the Sellers pursuant to repurchase contracts but in respect of which either the relevant Seller had not paid Trafigura all (or, in the vast majority of cases, any) of the agreed repurchase price, or the nickel was not subject to a repurchase contract at all; and (ii) 11 further trades (principally proposed and arranged by an affiliate of Mr. Gupta acting, it is inferred, on behalf of the relevant Seller and/or under the ultimate direction of Mr. Gupta), in respect of which Trafigura then onsold the nickel to third parties, for which Trafigura was repaid in full.

7. On 9 November 2022, Trafigura inspected certain containers shipped by one of the Sellers (which had by then been repurchased by another one of the Sellers) and discovered that the containers did not contain nickel, but rather contained what appeared to be carbon steel, which was worth only a small fraction of the value of nickel.

8. On 22 December 2022, Trafigura inspected another eight containers from another one of the Sellers. Those containers likewise contained what appeared to be carbon steel rather than nickel. Based on Trafigura's further inspections since December 2022, the vast majority of the containers shipped pursuant to the Master Contracts and/or the Disputed Trades did not contain nickel – instead, they contained much less valuable or near worthless materials.

9. On 8 February 2023, Trafigura issued a claim against Mr. Gupta and the Sellers in the English High Court by filing the Claim Form attached as Exhibit A. Subsequently, on 3 May 2023, Trafigura filed and served the Particulars of Claim attached as Exhibit B. Amongst other things, Trafigura (i) alleged claims for fraudulent misrepresentation, deceit, and/or unlawful means conspiracy; and (ii) sought declarations that it had validly rescinded the contracts or alternatively rescission of the contracts. In the alternative, Trafigura alleged breach of contract based on the Sellers' failure to deliver the material they were contractually obligated to deliver and sought damages in respect of the same.

10. In addition, as elaborated at paragraphs 36 to 38 of the Particulars of Claim attached as Exhibit B, Trafigura alleged what are known in English legal practice as "proprietary" claims. Trafigura's proprietary claims sought to recover all moneys paid and credits given to the Sellers in respect of the Disputed Trades as well as all fruits and traceable proceeds of those moneys or credits. Trafigura alleged (amongst other things) that the Disputed Trades were vehicles for obtaining moneys from Trafigura fraudulently and under false pretences, and that beneficial title in the moneys paid (or the value of credit given) by Trafigura in respect of the Disputed Trades therefore did not pass to the Sellers, but instead remained in constructive trust for the benefit of Trafigura.

11. In February 2023, the English court issued an ex parte worldwide freezing order against the Defendants. A true and correct copy of the publicly available freezing order dated 24 February 2023 (excluding its confidential schedules) is attached as **Exhibit C**, with certain bank account information redacted. The freezing order (amongst other things) prohibits the Defendants from disposing of, dealing with, or diminishing the value of any of their assets, whether in or outside England and Wales, up to the value of USD $625 million (subject to certain exceptions). The freezing order applies to all the Defendants' assets whether or not they are in their own name and includes in particular the specified "proprietary funds" for each Seller, defined as the U.S. dollar amounts which Trafigura paid to each Seller under the relevant contracts and any fruits and traceable proceeds thereof.

12. On 19 May 2023, the English court issued another freezing order, this time against Mr. Gupta's wife, Ginni Gupta, preventing her from disposing of certain assets on the basis that there was reason to believe that she was holding them on behalf of her husband.

13. On 12 July 2023, the First to Fifth Defendants (i.e., Mr. Gupta and four of his companies) filed and served a Statement of Defence in response to the Particulars of Claim dated

3 May 2023. In that pleading, the First to Fifth Defendants did not deny that they had shipped containers with worthless or less valuable materials rather than nickel. Instead, they defended the claim on the ground that the shipments were part of a scheme devised by Trafigura's own employees in which those employees asked the Sellers to ship them worthless or less valuable materials. For completeness, I note that the First to Fifth Defendants have said they intend to make an application to the court for permission to amend their Statement of Defence and sent my firm a copy of their proposed amendments in December 2024. The Sixth to Eighth Defendants have each filed a bare defence to the claim, but have had minimal involvement in the English proceedings since then and are currently unrepresented.

14. The First to Fifth Defendants also moved to discharge the Court's worldwide freezing order. On 15 December 2023, following a two-day hearing, the English court denied the First to Fifth Defendants' application to discharge the freezing order. A true and correct copy of that decision is attached as **Exhibit D**. The First to Fifth Defendants had argued that Trafigura violated its duty of "full and frank disclosure" when seeking an ex parte freezing order by not adequately disclosing that certain of Trafigura's own senior employees supposedly knew the containers did not contain nickel and therefore that the evidence Trafigura filed in support of its application for a freezing order was materially misleading. The First to Fifth Defendants focused in particular on Trafigura's nickel trader Harshdeep Bhatia in Mumbai and Trafigura's head of nickel and cobalt trading Sokratis Oikonomou in Geneva.

15. The English court rejected the First to Fifth Defendants' argument. The English court was "not satisfied that the materials shown . . . should have put Trafigura on notice that there was a real possibility that Mr Oikonomou was involved in or knew about the alleged fraud." Ex. D ¶ 75. The court added that, "[i]f relevant, I would say the same about Mr Bhatia and the traders working under him, but it is apparent that enough was said to Foxton J [the judge

5

who granted the ex parte freezing order] that he was in any event well aware of the possibility." *Id.* The court accordingly denied the motion to discharge the freezing order.

16. Following applications for disclosure made by Trafigura, on 29 February 2024 and 5 March 2024, the English court issued disclosure orders against each of the Defendants. True and correct copies of the disclosure orders are attached as **Exhibit E** and **Exhibit F**, respectively. The orders required the Defendants to disclose what they have done with the purchase payments they received from Trafigura. The disclosure orders also required the First to Fifth Defendants to disclose any substitute property they received in exchange for the money that Trafigura paid.

17. The Defendants' disclosures in response to these orders is subject to collateral use restrictions that limit what I can say about the disclosures. That said, to date, the First to Fifth Defendants have provided minimal disclosure in response to the 29 February order, and the disclosure they have provided is incomplete in that it does not show the ultimate destination of the proprietary funds. The Sixth to Eighth Defendants have provided no disclosure in response to the 5 March order. The result is that Trafigura is unable to ascertain who holds all the funds that it paid in respect of the Disputed Trades (and/or the fruits or traceable proceeds of the same). Trafigura's position is that the Defendants have effectively breached the orders by providing incomplete disclosure. To date, the Defendants have provided no meaningful explanation for this breach, other than to say that further disclosure will be provided at the point of giving their general disclosure in the Proceedings.

18. The general disclosure in the English proceedings was initially due on 30 September 2024, but the First to Fifth Defendants have twice sought an extension to that deadline, and the parties are now due to give disclosure in the Proceedings on 28 February 2025. To date, the Defendants have failed to adequately engage in the disclosure process and it remains

unclear what, if any, further disclosure they will give in respect of the ultimate destination of the proprietary funds. The First to Fifth Defendants have also alleged, in a public hearing which took place on 13 December 2024, that funding constraints hindered their ability to progress the disclosure process. They claim to have received some funding in the meantime, but it is not known whether that funding is sufficient for the purposes of the entire review exercise.

19. Under the English court's current case schedule, witness statements are to be filed by 16 May 2025, and the case has been scheduled for trial starting on 10 November 2025.

**The Need for Discovery from U.S. Banks**

20. To assist with the prosecution of its claims against Mr. Gupta and the Sellers, Trafigura seeks discovery from U.S. banks that would show where Mr. Gupta and the Sellers transferred the purchase proceeds they received in exchange for the fraudulent shipments.

21. As explained above, one of the claims that Trafigura asserts against the Sellers in the English litigation is a "proprietary" claim in respect of all moneys paid (and credits given) to the Sellers in respect of the Disputed Trades. Under English law, a proprietary claim permits a claimant to recover from a defendant the specific property that the defendant obtained through fraud or deceit. A proprietary claim also permits the claimant to obtain any fruits and traceable proceeds of the property that the defendant fraudulently obtained.

22. Where the defendant has transferred the claimant's property to a third party, a proprietary claim also permits the claimant to seek to recover the property from that third party, although the claimant's right to recover may be limited where the third party acquired the property for fair value without knowledge of the fraud. Proprietary claims are thus "proprietary" in the sense that they focus on the specific property wrongfully obtained and provide the claimant with a mechanism for tracing that specific property as it changes hands and ultimately recovering the property from its ultimate custodian.

23. Trafigura's efforts to pursue its proprietary claims in the English litigation have been stymied by the Defendants' failure to date to provide sufficient information for Trafigura to determine what they did with all the funds that Trafigura paid in respect of the Disputed Trades or who currently holds those funds. Absent that information, Trafigura faces severe challenges locating the funds it paid or their current custodian. As a result, Trafigura cannot fully prosecute its proprietary claims in the English litigation.

24. The U.S. banks from which Trafigura seeks discovery in this Section 1782 action likely have records that would greatly assist Trafigura in prosecuting its proprietary claims.

25. As noted above, and as reflected in the "proprietary funds" charts in Exhibit C, all the payments that Trafigura made for the fraudulent nickel sales were U.S. dollar transactions. Therefore, the funds targeted by Trafigura's proprietary claims are (or, at a minimum, were at some point in time) in U.S. dollars.

26. I have reviewed the list of search terms attached as Exhibit A-1 to Trafigura's proposed subpoena in this Section 1782 proceeding. I coordinated the preparation of this search term list based on investigations conducted at the direction of my firm. Attached as **Exhibit G** is a chart listing the proposed search terms in Exhibit A-1 and the justifications for including those persons and entities on the list of search terms.

27. As shown in Exhibit G, the first eight search terms correspond to the eight named Defendants in the English proceedings. The Defendants are included on the search term list because records showing payments from them during the relevant timeframe could identify the specific persons or entities to which the Defendants transferred the purchase proceeds that are the target of Trafigura's proprietary claims.

28. The remaining search terms in Exhibit A-1 correspond to persons and entities that, although not named Defendants in the English proceedings, are closely related to those

named Defendants. Trafigura seeks discovery relating to payments to or from those additional persons and entities because the named Defendants may have used those related parties to transfer the purchase proceeds that are the target of Trafigura's proprietary claims. The chart attached as Exhibit G explains the justification for including each of those persons and entities on the list of search terms based on my understanding from the investigations directed by my firm. Where the findings of the investigations directed by my firm are inconclusive, I make that clear in the chart attached as Exhibit G and explain the position to the best of my knowledge and belief at this time.

29. If Trafigura's subpoenas yielded relevant information about what the Sellers have done with the purchase payments that Trafigura sent them, I believe the English courts would be receptive to that information in adjudicating Trafigura's proprietary claims. I am not aware of any English evidentiary rule that would prohibit the admission of such banking records in the English proceedings. To the contrary, in my experience, English courts routinely receive this type of evidence in civil matters.

30. As a general principle, if evidence is relevant to the matters in issue, it will be admissible in an English civil proceeding, and the English courts do not concern themselves with the manner in which parties choose to obtain evidence. It is well established that a litigant in English proceedings may invoke the Section 1782 procedure in the United States in an effort to obtain evidence for use in an English proceeding. *See South Carolina Co. v Assurantie Maatschappij "De Zeven" Provincien N.V.*, [1987] 1 AC 24; *Royal Bank of Scotland plc v Hicks*, [2011] EWHC 287 (Ch.). Recent examples of the English High Court considering evidence obtained through the Section 1782 procedure include *Federal Republic of Nigeria v Process & Industrial Developments Ltd.*, [2020] EWHC 2379 (Comm.), and *Tatiana Akhmedova v Farkhad Teimur Akhmedov*, [2019] EWHC 2561 (Fam.). While the English courts have

occasionally restrained the use of Section 1782, they have done so only where the Section 1782 application is "unconscionable", for example, where it is was being pursued in a manner that was disruptive to the English proceedings to the point of being procedurally and forensically unfair and oppressive. *See, e.g.*, *Benfield Holdings Ltd. v Richardson*, [2007] EWHC 171 (Q.B.).

31. I do not believe that the English court would consider a third-party subpoena issued under Section 1782 in the present case to be an improper circumvention of any restrictions on evidence-gathering in the English proceedings. The English system includes various provisions for mandatory disclosure of evidence, including documentary evidence, from both parties and non-parties to the underlying proceedings. For example, pursuant to Rule 31.17 of the Civil Procedure Rules, the court may order disclosure from a non-party to the proceedings where documents of which disclosure is sought are likely to support the case of the applicant or adversely affect the case of one of the other parties to the proceedings.

32. In the present case, the English court has issued two disclosure orders to the Defendants, directing them to reveal the same sorts of financial information that Trafigura now seeks through Section 1782 discovery. To date, the Defendants have failed to provide sufficient information for Trafigura to determine who holds all the money that it paid in respect of the Disputed Trades, which is part of the reason why Trafigura must now resort to discovery from the U.S. banks directly. Additionally, it is hoped that discovery obtained from the U.S. banks directly will enable Trafigura to independently trace the payments it made in respect of the Disputed Trades.

33. In short, I believe that Trafigura's subpoenas are reasonably calculated to identify evidence relevant to Trafigura's proprietary claims and that, if the subpoenas are successful in obtaining such evidence, the English court is likely to be receptive to that evidence in the English proceedings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January  27  2025.
London, England

_____
Humpreet Kaur Grigoriadis