# Exhibit B

IN THE HIGH COURT OF JUSTICE  Claim No. CL-2023-000054
BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
COMMERCIAL COURT (KBD)

BETWEEN:

(1) TRAFIGURA PTE LTD
(2) TRAFIGURA INDIA PVT LTD   Claimants

- and -

(1) PRATEEK GUPTA
(2) UIL (SINGAPORE) PTE. LTD.
(3) UIL MALAYSIA LTD.
(4) TMT METALS AG, ZUG
(5) TMT METALS (UK) LTD
(6) SPRING METAL LIMITED
(7) MINE CRAFT LIMITED
(8) NEW ALLOYS TRADING PTE. LTD.   Defendants

---

## PARTICULARS OF CLAIM

---

A  **THE PARTIES**

1  The First Claimant (**Trafigura Pte**) is a Singaporean commodity trading company specialising in the oil and gas, minerals and metals, power and carbon trading, and renewable energy markets. Its parent company, Trafigura Group Pte Ltd (the **Trafigura Group**), is also incorporated in Singapore.

2  The Second Claimant (**Trafigura India**) is the Indian trading subsidiary of the Trafigura Group. References herein to **Trafigura** are to Trafigura Pte and/or Trafigura India, as the context requires.

3  The First Defendant (**Mr Gupta**) is believed to be a Dominican citizen, who is also, or was previously, an Indian national. He is or was at all material times:

   3.1  the ultimate beneficial owner and/or controller of UD Trading Group Holding Pte Limited (**UD Group**) (a Singaporean company) and Ushdev International Limited (**UIL**), an Indian company (it is understood that UIL was recently restructured pursuant to an insolvency process, before which it was owned as to a minority interest by UD Group);

3.2 the indirect controlling shareholder of the Second and Third Defendants and an indirect shareholder of the Fourth and Fifth Defendants; and

3.3 the *de facto* or legal controller (generally or at least with respect to the matters that are the subject of this claim) of the Second to Eighth Defendants (the **Sellers**).

4 As to the Second and Third Defendants (together, the **UIL Entities**):

4.1 the Second Defendant (**UIL Singapore**) is a Singaporean company, which was at all material times owned (as to a majority interest) by UD Group and (as to a minority interest) by UIL; and

4.2 the Third Defendant (**UIL Malaysia**) is a Malaysian company, which is, or was at all material times, wholly owned by UD Group.

5 As to the Fourth and Fifth Defendants:

5.1 the Fourth Defendant (**TMT Metals AG**) is a Swiss company;

5.2 the Fifth Defendant (**TMT Metals UK**) is an English company; and

5.3 they are, or were at all material times, owned by TMT Metals Holdings Limited (**TMT Metals Holdings**), an English company that is, or was at all material times, controlled by Mr Gupta.

6 The Sixth Defendant (**Spring Metal**) is a Malaysian company, which holds itself out as a multi-commodity trading company.

7 The Seventh Defendant (**Mine Craft**) is a Hong Kong company.

8 The Eighth Defendant (**New Alloys**) is a Singaporean company, which holds itself out as a wholesale metal trading company.

B THE MASTER CONTRACTS

9 By a series of contracts entered into between October 2021 and August 2022 (as in some cases amended from time-to-time), Trafigura agreed to purchase and one of the Sellers agreed to sell on CIF terms a specified total quantity of high-quality nickel of a stated specification (**Nickel**), to be shipped in instalments as agreed thereafter between the parties (the **Master Contracts**). The parties to and principal terms of

each Master Contract are set out in **Annex 1** hereto. Trafigura will rely upon each Master Contract for its full terms and true effect.

10  The Master Contracts were principally negotiated by Mr Girdhar Rathi (a Singapore-based operations executive) on behalf of the relevant Seller, acting (it is to be inferred from the matters set out herein) under the ultimate direction of Mr Gupta.

11  During the negotiations for each Master Contract, and in order to induce Trafigura to enter into it, the relevant Seller represented to Trafigura that it intended honestly to perform its obligation to supply Nickel under the particular Master Contract.

12  These representations (the **Master Contract Representations**) were made in pre-contract communications from or on behalf of the relevant Seller and/or in drafts of the relevant Master Contract and/or by conduct, in circumstances where the Sellers gave the impression that the relevant negotiations were commercial negotiations being conducted in good faith. Further or alternatively, in light of the fact that the relevant negotiations were, or (as was intended by the relevant Seller) appeared to be, commercial negotiations, they fall to be implied.

13  As the relevant Seller knew and intended, in entering into each of the Master Contracts, Trafigura relied upon the truth of, and was induced by, the Master Contract Representations.

## C  THE TRADES AND THE CARGOES

14  As envisaged in each Master Contract, the parties thereafter negotiated and agreed individual sales and purchases of consignments (described by Trafigura as 'assignments') of Nickel (the **Trades**) to be effected by separate shipments of an agreed quantity of Nickel (the **Cargoes**) in one or more shipping containers (the **Containers**).

15  The Trades were principally negotiated and arranged by Mr Rathi on behalf of the relevant Seller, acting (it is to be inferred from the matters set out herein) under the ultimate direction of Mr Gupta.

16  Between around 23 September 2021 and 4 July 2022, around 86 Trades were agreed and performed (the **Completed Trades**). As to these:

   16.1  the bulk of the relevant Cargoes were in turn re-purchased from Trafigura by certain of the Sellers (the **Buyers**) pursuant to re-purchase contracts (the

**Repurchase Contracts**), for which Trafigura was paid in full (in cash and/or by way of set-off against sums Trafigura understood at that time, as a result of the Representations (as defined below), that it owed to the Sellers);

16.2 a small number of Cargoes purchased from New Alloys and UIL Malaysia were sold by Trafigura to its other clients;

16.3 the Sellers (acting, it is to be inferred, under the ultimate direction of Mr Gupta) and/or Mr Rathi (acting, it is to be inferred, on behalf of the relevant Seller and/or under the ultimate direction of Mr Gupta) directed and/or controlled which of the Cargoes were available to be supplied to Trafigura's other clients (as pleaded at paragraph 16.2 above), and which were to be resold back to the Buyers (as pleaded at paragraph 16.1 above); and

16.4 Trafigura had not opened the relevant Containers or inspected their contents prior to their being (re-)purchased, and paid for, as aforesaid.

17 As of November 2022, when (as set out further below) Trafigura discovered that certain of the Containers did not in fact contain Nickel:

17.1 there were 100 further Trades (the **Remaining Trades**) for which Trafigura had paid the relevant Seller (in cash and/or by way of set-off against sums Trafigura understood at that time it owed to the relevant Seller), but in respect of which the relevant Cargoes:

17.1.1 were the subject of a Repurchase Contract, for which the relevant Seller had not paid Trafigura all (or, in the vast majority of cases, any) of the agreed re-purchase price; or

17.1.2 were not the subject of (because they had not been allocated to) a Repurchase Contract at all;

17.2 there were 11 Trades (the **3P Trades**), in respect of which:

17.2.1 Trafigura had sold the relevant Cargoes to third-party purchasers (the **Third Parties**);

17.2.2 Trafigura had been paid in full by the Third Parties; and

17.3 Trafigura had not previously opened the relevant Containers or inspected their contents (including, in relation to the 3P Trades, prior to their being on-sold, and paid for, as aforesaid).

18 The 3P Trades were principally proposed and arranged by Mr Rathi acting (it is to be inferred) on behalf of the relevant Seller and/or under the ultimate direction of Mr Gupta.

19 Particulars of the Remaining Trades and the 3P Trades (collectively, the **Disputed Trades**) are set out in **Annexes 2 and 3** hereto respectively. The Cargoes shipped pursuant to the Disputed Trades are referred to herein as the **Disputed Cargoes**.

20 In respect of each Disputed Trade:

20.1 in order to induce Trafigura to agree to purchase (and pay for) the relevant Cargo, the relevant Seller represented to Trafigura:

20.1.1 during the negotiations that it intended to arrange a shipment of Nickel as envisaged by the relevant Master Contract; and/or

20.1.2 either by conduct (by negotiating a particular Trade) or impliedly (by negotiating and agreeing to a particular Trade) that it intended honestly to perform its obligation to supply Nickel pursuant to the particular Trade and/or under the Master Contract; and

20.2 in order to induce Trafigura to pay for the Cargo, the relevant Seller supplied to Trafigura (or caused or procured the supply to Trafigura of) bills of lading, commercial invoices and/or insurance certificates, which it knew contained representations that a genuine consignment of Nickel was to be and/or had been shipped in the relevant Containers, as set out in **Annexes 4 and 5** hereto.

21 As the relevant Seller knew and intended, in agreeing to and/or making payment in respect of each of the Disputed Trades, Trafigura relied upon the truth of, and was induced by, the representations set out in the preceding paragraph and/or the Master Contract Representations (which, together, are referred to herein as the **Representations**).

22 Further, the putative Buyers of the Cargoes referred to at paragraph 17.1.1 above knew that the relevant Seller had made the Representations in relation to the re-

purchased Cargoes; and, as the Buyers knew and intended, in agreeing to the re-purchases, Trafigura relied upon the truth of, and was induced by, the Representations.

**D   THE EMERGENCE OF THE ALLEGED FRAUD**

23   From November 2022, Trafigura received correspondence from the Third Parties asserting issues with and/or claims in respect of certain of the Cargoes sold to them and/or the associated bills of lading. Amongst other things, the Third Parties stated that the said Cargoes did not meet the description or specifications stated in the relevant contracts or bills of lading.

24   Mr Gupta indicated to Trafigura that he would address the issues and/or claims raised by the Third Parties directly with the latter.

25   On 9 November 2022, Trafigura inspected certain of the Containers shipped by TMT Metals UK, which had by then been re-purchased by UIL Malaysia. This (the **November Inspection**) revealed that the relevant Containers actually contained what appeared to be carbon steel, which was worth a small fraction of the value of Nickel.

26   On or around 10 November 2022, Mr Gupta informed Trafigura that he expected some of the Cargoes purchased from TMT Metals UK to consist of high-grade nickel alloy (rather than Nickel); and that he would need to verify the results of the November Inspection with his 'aggregators' (which was, it is to be inferred, a reference to the Sellers).

27   On or around 15 November 2022, Mr Gupta repeated to Trafigura that certain of the Cargoes purchased from the Sellers would consist of nickel alloy (rather than Nickel).

28   In or around late November or early December 2022, Mr Gupta caused or procured the provision to Trafigura of a spreadsheet entitled "*Cargo details – Traf*" (the **Materials Spreadsheet**). This indicated that, of the Cargoes shipped pursuant to 93 of the Remaining Trades: three were of aluminium; 15 were of carbon steel; and 75 were of nickel alloys (of unspecified composition).

29  On 22 December 2022, Trafigura inspected eight Containers shipped by Spring Metal. This (the **December Inspection**) also revealed that the relevant Containers actually contained what appeared to be carbon steel.

30  Since then, Trafigura has inspected 197 more of the Containers. None of them has been found to contain Nickel (as opposed to worthless or much less valuable (or unidentified) materials). The results are set out in **Annex 6** hereto.

31  From November 2022 until early February 2023, Mr Gupta put forward a number of proposals to compensate Trafigura for the Sellers' wrongful failure to supply Nickel to Trafigura. The only payment that has been made to Trafigura by any of the Defendants, however, is US$5 million received from TMT Metals UK on, or around, 31 January 2023 (the **TMT Metals UK Payment**).

32  Further, it now appears that there are potentially issues in relation to at least eight of the bills of lading[1] provided by UIL Malaysia to (and still held by) Trafigura pursuant to certain of the Disputed Trades. Amongst other things, various third parties allege (or have alleged) that they also hold bills of lading in respect of the same Cargoes. Trafigura is investigating the position and, for the moment, reserves all of its rights.

E   **TRAFIGURA'S CLAIMS**

E1  **Rescission for Fraudulent Misrepresentation**

33  In the premises:

    33.1  it is to be inferred that:

        33.1.1  at most only a minority of the Cargoes shipped pursuant to the Master Contracts (and none, alternatively only a minority, of the Cargoes shipped pursuant to the Disputed Trades), actually consisted of Nickel, but instead consisted of other much less valuable or worthless materials; and

        33.1.2  the Sellers never intended that each and every Cargo to be shipped pursuant to the Master Contracts and/or all (or any) shipped

---

[1] Bearing the numbers: OOLU2702252220, OOLU2704265540, BLPLPGU2200200, BLPLPGU2200214, BLPLPGU2200222, MAEU218437143, MAEU221715093 and MAEU218910101.

pursuant to the Disputed Trades would consist of Nickel (and at all times they and the Buyers knew that they did not);

33.2 each of the Representations was therefore false when made (and remained false at all times thereafter); and

33.3 each of the Representations was made fraudulently, in that the Sellers (and the Buyers) knew that they were false or were reckless as to whether they were true or false.

PARTICULARS OF FALSITY AND FRAUD

33.4 It is to be inferred from the facts and matters set out above, including the fact that the bulk of the Containers shipped pursuant to the Master Contracts and/or the Disputed Trades appear not to have contained Nickel, that:

33.4.1 the Sellers deliberately did not supply Nickel in accordance with the terms of the Master Contracts and/or the Disputed Trades;

33.4.2 the Sellers knew at the time the Master Contracts were negotiated and agreed that they did not intend honestly to perform their obligations to supply Nickel;

33.4.3 the Sellers knew at the time the Disputed Trades were negotiated and agreed that they did not intend:

33.4.3.1. to arrange for the supply of Nickel as envisaged by the relevant Master Contract; and/or

33.4.3.2. honestly to perform their obligations to supply Nickel; and/or

33.4.4 at or around the time payment was requested and/or received by the Sellers in relation to each Disputed Trade, the Sellers knew they had not supplied (or were not intending to supply) Nickel.

33.5 It is further to be inferred that the putative Buyers of the Cargoes referred to at paragraph 17.1.1 above knew that the Representations were false when made because:

- 8 -



33.5.1 of Mr Gupta's common ownership and/or control of the Buyers and Sellers; and

33.5.2 the Buyers also acted as Sellers under the Master Contracts and therefore also (knowingly) made the Master Contract Representations.

Trafigura was therefore entitled to, and by service of the claim form and/or the skeleton argument for the without notice worldwide freezing order application it made in these proceedings on 8 February 2023 herein did, rescind the Master Contracts (in their entirety; alternatively, to the extent of the Disputed Trades) and/or the Disputed Trades themselves (and, if and to the extent necessary, the Repurchase Contracts); and seeks a declaration to that effect.

34  Alternatively, Trafigura is entitled to an order rescinding the Master Contracts (in their entirety; alternatively, to the extent of the Disputed Trades) and/or the Disputed Trades themselves (and, if and to the extent necessary, the Repurchase Contracts) in equity.

35  In either case, Trafigura is entitled to advance (and hereby advances) an equitable proprietary claim in respect of all moneys paid and credits given to the Sellers in respect of the Disputed Trades (and the fruits or traceable proceeds of the said moneys or credits).

E2  Trusts

36  Alternatively, by reason of the matters set out above, the Master Contracts and/or the Disputed Trades were vehicles for obtaining moneys from Trafigura fraudulently and under false pretences and/or were (and/or were effected by) instruments of fraud. Accordingly, beneficial title in the moneys paid (or in the value of any credit given) by Trafigura in respect of the Disputed Trades did not pass from Trafigura to the Sellers, who therefore hold (or held) the same on constructive trust for Trafigura.

37  Further, or alternatively, the Sellers hold or held the moneys paid (or the value of any credit given) by Trafigura in respect of the Disputed Trades on constructive (and/or resulting) trust for Trafigura because:

37.1 Trafigura paid or gave the same in the mistaken belief (induced by the Sellers) that the Disputed Cargoes consisted of Nickel;

37.2 the Sellers procured the same through the fraud particularised herein; and/or

37.3 there was a total failure of basis in that the Sellers (knowingly) failed to perform their contractual obligation to supply Nickel, such that the obligation on Trafigura to pay never arose.

38 In the premises, Trafigura is entitled to advance (and hereby advances) a proprietary claim in respect of all moneys paid (and credits given) to the Sellers in respect of the Disputed Trades (and the fruits or traceable proceeds of the said moneys or credits).

## E3 Damages for Deceit

39 Further or alternatively, as a result of the foregoing:

39.1 Trafigura has suffered loss and damage in that:

39.1.1 it paid the agreed price for the Disputed Cargoes, which did not consist of Nickel but were instead of little or no value to Trafigura; and

39.1.2 it is exposed to claims by and/or liability to the Third Parties in respect of the 3P Trades; and

39.2 the Sellers are therefore liable to Trafigura for damages in deceit in respect of the same.

40 Further, in the circumstances set out above, which include:

PARTICULARS OF MR GUPTA'S KNOWLEDGE AND DIRECTION *etc.*

40.1 Mr Gupta's ownership and/or control of the Sellers;

40.2 that Mr Gupta dealt with Trafigura on the basis that he had overall responsibility for the dealings referred to herein;

40.3 the provision by Mr Gupta of the 'Materials Spreadsheet' to Trafigura in the circumstances pleaded at paragraph 28 above;



40.4 the settlement proposals made by Mr Gupta on behalf of the Sellers; and

40.5 the employment by each of the Sellers of an identical *modus operandi* in effecting the alleged fraud (as pleaded above),

it is to be inferred that Mr Gupta induced, directed and/or otherwise caused or procured the Sellers to commit the deceits set out above. He is consequently personally liable to Trafigura as a joint tortfeasor for damages in deceit.

## E4 Procuring breaches of contract

41 Further or alternatively, Mr Gupta induced the Sellers to breach the Master Contracts and/or the terms of the Disputed Trades (as set out in paragraph 46 below) by encouraging, causing, procuring or otherwise assisting them (directly or indirectly) in those breaches. Paragraph 40 above is repeated *mutatis mutandis*. In so acting, it is inferred that Mr Gupta knew and intended that the Sellers would act to breach them, and Mr Gupta is accordingly liable in tort for the loss and damage thereby caused, as set out herein.

## E5 Unlawful means conspiracy

42 Further or alternatively, on a date or dates unknown to Trafigura, the Defendants (or any two or more of them) together wrongfully conspired and combined together to injure Trafigura by unlawful means. As to this:

PARTICULARS OF CONSPIRACY

42.1 the existence of the conspiracy and/or combination falls to be inferred from the facts and matters pleaded above, including in particular:

42.1.1 Mr Gupta's ownership and/or control of the Sellers;

42.1.2 the Sellers' common representation by Mr Rathi;

42.1.3 the provision of the Materials Spreadsheet in the circumstances pleaded at paragraph 28 above;

42.1.4 the settlement proposals made by Mr Gupta on behalf of the Sellers; and/or

42.1.5 the employment by each of the Sellers of an identical *modus operandi* in effecting the alleged fraud (as pleaded above);

42.2 the unlawful means consisted of:

PARTICULARS OF UNLAWFUL MEANS

42.2.1 the deceit (as pleaded above);

42.2.2 the procurement of breaches of contract (as pleaded above);

42.2.3 the employment of instruments of fraud (as pleaded above);

42.2.4 the unjust enrichment (pleaded below); and/or

42.2.5 (on Trafigura's alternative case) the breaches of contract (as pleaded below).

43 As a result of the matters set out above, Trafigura has suffered the loss and damage set out above, for which each of the Defendants is jointly and severally liable to compensate Trafigura in damages for conspiracy.

### E6 Unjust enrichment

44 Further or alternatively, the Sellers have been unjustly enriched at Trafigura's expense because:

44.1 there has been a total failure of basis; and/or

44.2 Trafigura paid for the Disputed Cargoes in the mistaken belief that they consisted of Nickel (and would not have done so had it known the truth).

45 Accordingly, Trafigura is entitled to (and hereby claims) a personal restitutionary award from the Sellers in the amount of the value of their unjust enrichment, viz. the price Trafigura paid (in cash and/or by way of set-off) less the value to Trafigura (if any) of the Disputed Cargoes.

### E7 Breach of contract

46. Alternatively, if and to the extent that the Master Contracts and/or the Disputed Trades have not been or cannot be rescinded:

46.1 the Sellers breached the express terms of the Master Contracts and/or the Disputed Trades in that they failed to supply Nickel thereunder; and

46.2 as a result of those breaches, Trafigura has suffered loss and damage, being:

    46.2.1 the price paid (or credit given) by Trafigura to the Sellers (as particularised in Annexes 2 and 3 hereto), less the value to Trafigura (if any) of the material actually supplied by the Sellers; and

    46.2.2 the amount of the claims by and/or any liability to the Third Parties in relation to the 3P Claims.

## E8   Interest

47   Further, Trafigura is entitled to (and claims) (*a*) compound (alternatively, simple) interest pursuant to the Court's equitable jurisdiction; and/or (*b*) interest pursuant to section 35A of the Senior Courts Act 1981, on all sums found due to Trafigura, at such rates, and for such periods (and, where appropriate, with such rests) as the Court thinks fit.

**AND** Trafigura claims:

(1) declarations that it has validly rescinded the Master Contracts (in their entirety; alternatively, to the extent of the Disputed Trades) and/or the Disputed Trades and/or the Repurchase Contracts (in their entirety; alternatively, to the extent of the Disputed Trades);

(2) alternatively, orders for rescission of the same (to the same extent) (alternatively, damages in lieu of rescission);

(3) declarations that Trafigura is entitled to trace into the payments made (or credits given) in respect of the Disputed Trades (and the fruits or traceable proceeds of the said moneys or credits);

(4) declarations that the Sellers hold the sums paid (or credits given) by Trafigura in respect of the Disputed Trades (and the fruits or traceable proceeds of the same) on trust for Trafigura;

(5) such orders or other relief as is appropriate to give effect to (1)-(4) above, including (without limitation) orders for the payment to Trafigura of all sums paid in respect of the Disputed Cargoes;

(6) an indemnity against any claims made by and/or any liability it may have to the Third Parties;

(7) damages and/or equitable compensation;

(8) further or other relief, including all further necessary or appropriate accounts, inquiries, and directions; and/or

(9) interest as aforesaid.

NATHAN PILLOW KC

DAVID PETERS

FELIX WARDLE

Served this day 3rd May 2023 on behalf of the Claimants by Stephenson Harwood LLP, 1 Finsbury Circus, London, EC2M 7SH.

## STATEMENT OF TRUTH

The Claimants believe the facts stated in these Particulars of Claim are true. The Claimants understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

I am duly authorised to sign this statement of truth on behalf of the Claimants.

Signed: *[signature]*

Name: NAEEM AHMED

Position held: GLOBAL HEAD of POLITICAL RISK, ENERGY

Date: 03/05/23