# Exhibit D



Neutral Citation Number: [2023] EWHC 3184 (Comm)

Case No: CL-2023-000054

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (KBD)**

Royal Courts of Justice, Rolls Building
Fetter Lane, London, WC4A 1NL

Date: 15 December 2023

**Before** :

**MR JUSTICE BRIGHT**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

(1) Trafigura Pte. Ltd.
(2) Trafigura India Pvt. Ltd.

**Claimants**

- and -

(1) Prateek Gupta
(2) UIL (Singapore) Pte. Ltd.
(3) UIL Malaysia Ltd.
(4) TMT Metals A.G., Zug
(5) TMT Metals (UK) Ltd.
(6) Spring Metal Ltd.
(7) Mine Craft Ltd.
(8) New Alloys Trading Pte. Ltd.

**Defendants**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

Nathan Pillow KC, David Peters and Felix Wardle (instructed by Stephenson Harwood LLP) for the Claimants
Robert Howe KC and Barnaby Lowe (instructed by Mishcon De Reya) for the First to Fifth Defendants

Hearing dates: 5, 6 December 2023

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

This judgment was handed down remotely at 10:00am on 15/12/2023 by circulation to the parties' representatives by e-mail and by release to the National Archives.
.............................

**Mr Justice Bright:**

1. This judgment concerns the application of the First to Fifth Defendants ("the MDR Defendants") for the discharge of a Worldwide Freezing Order ("WFO") granted by Foxton J on 8 February 2023 (as subsequently amended). The grounds on which the application was brought were not set out in the application notice, but the MDR Defendants' case is that the Claimants (compendiously, "Trafigura") committed serious failures to comply with their duty of full and frank disclosure when obtaining the WFO.

## The parties and the key individuals

2. Trafigura are commodities traders. The focus of this action is their trading in nickel, in particular from about September 2021 until about November 2022.

3. One of Trafigura's nickel traders over this period was Mr Harshdeep Bhatia. He was based in Mumbai. The trading team working for him in Mumbai included Mr Prajish Nair, Mr Divyanshu Sharma, Mr Anil Buddabasaynor and (from October 2021) Mr Dayansh Jain.

4. The head of Trafigura's nickel and cobalt trading over the period was Mr Sokratis Oikonomou, who was based in Geneva.

5. The First Defendant ("Mr Gupta") is in the business of trading metals and metal products. He is the ultimate beneficial owner of the other MDR Defendants. Day-to-day operations on the MDR Defendants' side were conducted by Mr Girdhar Rathi, the Second Defendant's head of trading.

## Summary of Trafigura's claim

6. The trading relationship between Trafigura and the MDR Defendants goes back to 2014. Initially, small volumes were traded, expanding into larger volumes of metals including nickel.

7. The sales from the MDR Defendants to Trafigura were CIF contracts on standard terms. Those terms included the requirement that the material sold be nickel of 99.8% quality, of a brand registered with the London Metal Exchange ("LME"). 90% of the price was payable against documents. The prescribed documents included a full set of bills of lading, the seller's invoice, certificate(s) of analysis/quality issued by the producer and an insurance certificate.

8. For the first several years of the trading relationship, the business consisted of wholly conventional sales. In 2018, the parties started to engage in "transit financing", by which some of the sales from the MDR Defendants to Trafigura included a provision as follows:

> "If mutually agreed between Buyer and Seller to sell the cargo back to Seller, the interest cost of [X]% shall be levied for the duration of title purchase by Buyer to title transfer to Seller. All related logistics expenses of moving cargo risk on to risk off shall be on account of the Seller (as per the contract) in case of buy back arrangement with the Seller."

9. The contracts that included such a provision were referred to as "buyback" contracts. The rate of interest that was stipulated varied from 4% to 6%.

10. Under these buyback contracts, the MDR Defendants were not obliged to buy back the nickel cargo, and Trafigura was not obliged to sell it to them. Nevertheless, there was a mutual expectation that this would happen. However, if the MDR Defendants (or the other Defendants) did not buy back the nickel, Trafigura could in principle sell it to a third party. Each buyback contract was akin to a loan at the stipulated rate of interest. The nickel cargo and the documents associated with it represented Trafigura's security for the relevant total sum.

11. By 2021-2022, a substantial proportion of the sales from the MDR Defendants to Trafigura were buyback contracts (Mr Gupta's figure is about 85%). The balance (i.e., approximately 15%) were conventional sales, under which it was always intended that Trafigura would sell onwards, to a third party.

12. Rapid rises in the market price for nickel in March 2022 caused the LME to require traders with open positions to provide substantial margin payments, which led Trafigura to become concerned that the MDR Defendants (or the other Defendants) were not buying back nickel in sufficient quantities or sufficiently promptly. This problem then seems to have abated somewhat for a few months, but Trafigura's concerns returned later in 2022.

13. In November 2022, Trafigura received complaints from third parties that nickel cargoes sold to them, which had originated from the MDR Defendants, did not meet the contractual description or specifications. On 9 November 2022, Trafigura inspected about 20 cargo containers, all related to buyback contracts. None of these 20 containers contained nickel; at best, they contained nickel alloy; some contained material with no significant nickel content at all.

14. Since then:

    i) In about early December 2022, Mr Gupta provided details of all or nearly all the cargoes under outstanding buyback contracts, set out in a spreadsheet which indicated that, in every case, the actual material was not nickel but, at best, nickel alloy.

    ii) Trafigura has conducted further inspections of further cargo containers, none of which contained nickel.

15. Trafigura's case is that there are about 100 outstanding buyback trades, under which the total sums paid by Trafigura were in excess of US$500 million; and that the material actually present in the relevant cargo containers is more or less worthless.

16. It further says that this is the result of a deliberate fraud, perpetrated by Mr Gupta and the other MDR Defendants.

**Trafigura's 'without notice' application for a WFO**

17. Having first appreciated the scale of the problem in November 2022, Trafigura in due course instructed lawyers who prepared its case. On 8 February 2023, Trafigura applied, without notice, for a WFO.

18. The application was primarily supported by an affidavit sworn by Mr Oikonomou, with additional affidavits from an in-house lawyer, Mr Ispahani, and from an external lawyer. In Mr Oikonomou's affidavit and in the other affidavits it was explained that the materials reviewed to date indicated a degree of "cosiness" between Mr Bhatia and Mr Gupta/Mr Rathi, such that Trafigura was concerned about Mr Bhatia "tipping off" the MDR Defendants. As a result, Trafigura had not sought to interview Mr Bhatia or the individual traders in Mumbai working under him (i.e., Mr Nair, Mr Sharma, Mr Buddabasaynor and Mr Jain). Furthermore, and for the same reason, Trafigura had been restricted in the written materials it had been able to harvest and review. Mr Oikonomou also stated that his own employment had recently been terminated by Trafigura.

19. The materials provided to the Court made it clear that Trafigura was not aware of any evidence that Mr Bhatia or anyone else within Trafigura was implicated in the alleged fraud, but that the limitations on its ability to inquire in advance of the application meant that there might be relevant material that was not before the Court.

20. On full and frank disclosure, Trafigura's skeleton argument stated as follows:

> "**C6 Full and frank disclosure in relation to injunctive relief**
> 45 Throughout the main body of this skeleton (and in its evidence) Trafigura has endeavoured to identify points which the Ds could take against it. However, it considers it appropriate to draw specific attention to the following matters for the purposes of compliance with its duty of full and frank disclosure:
>> 45.1 The Substantive Ds may well suggest (as Mr Gupta did on 15 November 2022) that the fact that the Trafigura Cargoes do not contain nickel is someone else's fault—and that whilst they may face liability for breach of contract, they are not liable for fraud. That is a matter of fact which, if raised, will have to be resolved at trial. It does not detract from the proposition that, as matters currently stand, Trafigura has (at the very least) a good arguable claim in fraud.
>> 45.2 The Substantive Ds may well also seek to suggest that Trafigura's relatively muted response to the information with which they were voluntarily provided (including, in particular, the Materials Spreadsheet) indicates that it was (and always had been) indifferent to the contents of the Trafigura Cargoes—especially in circumstances where it was proceeding on the basis that those cargoes would be sold back to one of the Corporate Ds. The argument would be that Trafigura never really relied on any representation as to the content of any particular cargoes because it was happy to take what was, in substance, a credit risk in relation to the Corporate Ds (and reference might be made to the discrepant or missing "HS" codes in many of the bills of lading or to Trafigura's failure always to insist on receipt of a Certificate of Analysis before payment). That is another argument which would be strongly disputed by Trafigura, and would be a matter for trial.
>> 45.3 Finally, it is possible that the Substantive Ds might go further, and argue

that Trafigura was positively *aware* that nickel was not being shipped, and was content to continue trading with them because of the return it was receiving on the transit finance it was providing. Such a case would require sufficient knowledge within Trafigura for that knowledge to be properly attributable to it, which is inherently improbable given the extent to which Trafigura itself is the victim of the alleged fraud. In any event such an argument would be disputed, and (again) would be a matter for trial."

21. The application was heard by Foxton J, who granted the WFO. It is apparent from the transcript that Foxton J was alive to the possibility that it might be said that some individuals within Trafigura knew about the alleged fraud. This prompted him to ask about Mr Oikonomou. It was confirmed that Trafigura did not have any concern that Mr Oikonomou might be involved, on the contrary Mr Oikonomou had been very co-operative and helpful. I infer from this that Foxton J appreciated that the MDR Defendants might say that Mr Bhatia knew about the alleged fraud.

## This application

22. On this application, the MDR Defendants do not say that Trafigura do not have a good arguable case. Indeed, their case (both in this application and in their Defence) accepts that many or all of the relevant containers did not contain nickel but, at best, nickel alloy. Furthermore, they accept that they (specifically, Mr Gupta and Mr Rathi) were aware of this at all material times.

23. The essence of the MDR Defendants' case before me was foreshadowed in a letter from their solicitors dated 10 July 2023, as follows:

> "… a number of senior employees of your clients, including at least Messrs. Oikonomou and Bhatia, and also a number of other members of your clients' trading team, were well aware that most of the cargoes did not contain LME-grade nickel and that the arrangements with the Defendants had, in fact, been set up at your clients' request and instigation. Accordingly, there was no deception on your clients and the evidence they filed in support of their WFO application was materially misleading as it failed to bring this important matter to the attention of the court."

24. The MDR Defendants referred to this as "the Arrangement". They said it was a scheme to which Trafigura was privy. They further said that Trafigura's involvement in and knowledge of the Arrangement, via Mr Oikonomou and Mr Bhatia (and others), should have been disclosed to Foxton J. Their application was supported by the Eleventh Affidavit of Mr Gupta.

25. Trafigura responded with further evidence from Mr Oikonomou as well as witness statements from various others, including Mr Bhatia and each of Mr Nair, Mr Sharma, Mr Buddabasaynor and Mr Jain (being the "other members of [Trafigura's] trading team" that the letter of 10 July 2023 evidently had in mind). These were all individuals whom Trafigura had not felt able to interview before 8 February 2023, because of the risk that the Defendants might be tipped off before the WFO could be granted. Having obtained the WFO, Trafigura could now interview these people.

26. The MDR Defendants replied with Mr Gupta's Twelfth Affidavit. Finally, there was a brief corrective solicitor's statement from Trafigura's side.

27. Despite the extensive materials deployed, the points in issue before me were relatively contained.

28. On behalf of the MDR Defendants, Mr Howe KC pointed to documentary evidence, which he said Trafigura either had reviewed or should have reviewed prior to applying on 8 February 2023, and which he said should have alerted Trafigura to the possibility that various individuals within Trafigura knew about the alleged fraud – in particular Mr Bhatia and Mr Oikonomou.

29. Mr Howe KC helpfully presented the relevant materials by grouping them under various discrete headings. His approach is reflected in the headings that follow, later in this judgment.

30. On behalf of Trafigura, Mr Pillow KC said that the relevant materials went no further than raising the possibility that Mr Bhatia may have known. He was careful to stress that he did not accept that the relevant materials showed that Mr Bhatia in fact knew about the alleged fraud, and that Trafigura's case was that Mr Bhatia did not know about the alleged fraud. However, Trafigura had done enough to flag to Foxton J the possibility that Mr Bhatia may have known about the alleged fraud, in the course of the application on 8 February 2023.

31. Mr Pillow KC said that none of the documents relied on by the MDR Defendants cast any suspicion at all on Mr Oikonomou. Therefore, he said, there had been nothing for Trafigura to disclose, as regards Mr Oikonomou.

32. He also said that, even if Mr Oikonomou, or anyone else at Trafigura, had known about the alleged fraud, this could not provide the MDR Defendants with a defence, because any such individuals would have been acting contrary to Trafigura's interests and in breach of duty to Trafigura, such that their knowledge could not be attributable to Trafigura; and this, too, had been disclosed to Foxton J.

33. I should make it clear that both Mr Howe KC and Mr Pillow KC emphasized that their respective submissions concerned only what should have been disclosed to Foxton J on 8 February 2023 as possible defences. Neither sought to persuade me to make any definitive findings. At this early stage, I cannot possibly decide whether any individual did or did not know about the alleged fraud – not least because the fraud, itself, must first be explored, tested and established at trial.

## HS codes and certificates of analysis

### HS codes

34. The bills of lading tendered to Trafigura generally (although not always) included HS codes. These are harmonized codes, used internationally to indicate the type of goods said to be inside the container. They are useful and, in many countries, necessary, for customs clearance.

35. In relation to the buyback contracts, the bills of lading often featured the HS code '75089090', which indicates "other articles of nickel and nickel alloy", rather than '75021000' which indicates "nickel, not alloyed". The MDR Defendants said that the Trafigura team checked every bill of lading, so they must have realised that the description of the goods on each bill of lading was not consistent with LME-grade nickel.

36. I was shown a bill of lading, said to be typical, on which the goods were described as follows:

    > "195 bundles of nickel full plate cathodes
    > Brand: Norilsk Nickel Harjavalta
    > HS Code: 75089090
    > Net weight 286.09 MT"

37. The task of checking the bills of lading fell to the team in Mumbai – variously, Mr Nair, Mr Sharma, Mr Buddabasaynor and Mr Jain. In the witness statements that they made in response to this application, each of them said that, while they had to check that the bills of lading conformed to the contract, they did not have to check the HS codes, because the contract did not contain any requirements in respect of HS codes. They all said that, while they had some familiarity with HS codes, they did not know all the relevant HS codes off by heart, and did not know that '75089090' was not consistent with LME-grade nickel.

38. Trafigura also suggested that the description "nickel full plate cathodes" was consistent (possibly, only consistent) with LME-grade nickel; and that Norilsk Nickel Harjavalta was a refiner of LME-grade nickel and an LME-approved brand.

39. There were some cases where Trafigura commented on how the HS code should be treated on the bill of lading. The evidence from Trafigura's Mumbai team was that these were all instances of sales to third-party purchasers, not buyback contracts. They said that such comments emanated from the intended third-party purchasers, and were simply passed on by Trafigura. The fact that comments were communicated by them did not indicate any familiarity on their part with HS codes, nor any preference on Trafigura's part as to which HS codes (if any) should appear.

Certificates of analysis

40. As to certificates of analysis, these were required documents under each individual contract. However, the MDR Defendants said, and Trafigura accepted, that in relation to about 55% of the relevant buyback contracts, no certificate of analysis was tendered. This must have been noticed when the documents were processed, but Trafigura nevertheless approved payment, despite certificates of analysis being contractually required.

41. The relevant individuals were, again, Mr Nair, Mr Sharma, Mr Buddabasaynor and Mr Jain. They all said that they were aware that in many instances there were no certificates of analysis. They said that they were told by Mr Bhatia that certificates of analysis were not required for buyback contracts; in part because of the expectation that the Defendants would repurchase the cargo, and in part because the buyback contracts generally concerned fairly large quantities, and it would have been time-consuming and

   difficult to match the certificates of analysis to the packing lists (so this would have held up payment).

42. More broadly, Mr Nair, Mr Sharma, Mr Buddabasaynor and Mr Jain all denied any knowledge of the alleged fraud. Mr Howe KC fairly accepted that, subject to his points in relation to HS codes and certificates of analysis, he could not point to anything suggesting the contrary.

The disclosure given to Foxton J on HS codes and certificates of analysis

43. When Trafigura made its application to Foxton J on 8 February 2023, Mr Ispahani's evidence noted that the bills of lading for some buyback contracts referred to anomalous HS codes, and that in some instances no certificates of analysis were tendered. He said that these matters remained unclear, because of the limitations on Trafigura's investigations caused by the concern that Mr Gupta and the other Defendants should not be tipped off; and that they would be investigated in due course. I have already set out paragraph 45.2 of Trafigura's skeleton argument for the application.

44. Mr Pillow KC made the point that, if Trafigura had not been limited by its concern about tipping-off, Mr Nair, Mr Sharma, Mr Buddabasaynor and Mr Jain would have been interviewed at that stage (i.e., prior to the application to Foxton J). Those individuals presumably would have given the same evidence as, in the event, they have now given, which exculpates them and which there is no real reason to doubt. Accordingly, there would not have been anything significant to disclose, as regards their knowledge of the alleged fraud.

45. Because their evidence in relation to certificates of analysis is that they acted on Mr Bhatia's instructions, their evidence would not have exculpated Mr Bhatia. If anything, it would have drawn more attention to the significance of his role. However, the queries relating to Mr Bhatia were fairly drawn to Foxton J's attention.

46. As regards Mr Oikonomou, there is no evidence that he had any involvement in or knowledge of HS codes on bills of lading, nor any involvement in or knowledge of certificates of analysis (or their absence). He had little involvement, if any, with Mr Nair, Mr Sharma, Mr Buddabasaynor or Mr Jain. This part of the MDR Defendants' case therefore does not take them any further, so far as Mr Oikonomou is concerned.

**Inspections**

47. Trafigura's concerns about the MDR Defendants' failure to buy back nickel began in March 2022, then became more acute in about October 2022. This was in part because Trafigura's financing banks (Citigroup Global Markets Ltd. and Citibank, N.A., London Branch – compendiously, "Citi") were becoming reluctant to roll over the credit they provided to Trafigura on the buyback contracts. From late October 2022, they wanted some of the nickel cargoes under the buyback contracts to be moved into LME warehouses, where they were liable to be inspected.

48. The materials Mr Howe KC particularly relied on, in relation to inspections, essentially related to two separate periods: March 2022 and October 2022.

The March 2022 WhatsApp exchanges and the 'Discussion Points' document

49. The MDR Defendants relied on WhatsApp exchanges in March 2022 between Mr Bhatia and Mr Gupta, in which it appears to have been the preference of everyone concerned that cargoes be re-purchased by the MDR Defendants, and then on-sold by them, rather than sent to LME warehouses. Mr Gupta said in his evidence, and Mr Howe KC repeated in submissions, that this showed (or least suggested the possibility) that they all knew that the cargoes did not consist of nickel and that this might be exposed if the cargoes went into LME warehouses.

50. However, Trafigura pointed to what was referred to as the 'Discussion Points' document – a memorandum created by Mr Gupta and sent to Mr Bhatia via WhatsApp on (I was told) 29 March 2022, in which Mr Gupta gave details of sales that the MDR Defendants had agreed with third parties. This referred to 2,767 mt being bought back from 16 March to 1 April 2022, followed by the set-off of 1,628 mt and a further reduction of 3,000 mt in April 2022, i.e. a total reduction from 26,000 mt to 18,605 mt by the end of April 2022.

51. Significantly, although this memorandum was sent on 29 March 2022, it seems to have been prepared earlier and to have reflected Mr Gupta's thinking on about 15 March 2022 (it referred at one point to "planned tonnages buyback" from 16 March 2022) – in other words, at the time of the WhatsApp messages relied on by the MDR Defendants.

52. Trafigura's explanation of the WhatsApp materials from March 2022, when taken together with the 'Discussion Points' document, is that they actually showed that it was Mr Gupta who was resistant to cargoes being moved into LME warehouses, because (he said) this would disrupt on-sales that had already been arranged, those on-sales being what would enable the MDR Defendants to repurchase more nickel and thus reduce the overall volume outstanding. It is common ground that there were telephone conversations in about mid-March 2022, some involving Mr Oikonomou. Trafigura said that, in those conversations, Mr Gupta gave assurances along the lines of the 'Discussion Points' document. Trafigura (including Mr Oikonomou) agreed that no cargoes would be moved into an LME warehouse without the consent of Mr Gupta or Mr Rathi, so as not to prejudice the repurchases and on-sales that they said were already arranged.

53. In other words, this had nothing to do with Mr Oikonomou or Mr Bhatia knowing that the material in the containers was not nickel.

The inspections required by Citi in October 2022

54. The MDR Defendants also referred to some exchanges in October 2022, which refer to the increasing pressure that Trafigura was coming under from Citi. In particular, they referred to an internal Trafigura email sent by Mr Thibaut Barthelme (Trafigura's Head of Trade Finance Refined Metals, in Geneva) to Mr. Oikonomou and Mr. Mehdi Wetterwald (Mr. Oikonomou's right-hand man and ultimate successor) on 24 October 2022, as follows:

> "*We had Citi on a call again on Friday… They are insisting on inspections, which we will have to do on the containers that are arriving at port. This is key for them and we can't avoid it this time…*

> *Then the question is do we want to get them involved in the inspection process. It will give them greater comfort if they are (ie if they still finance the containers which are checked) but if we find no materials or if there is an issue, they will know immediately and who knows how they will react. We can decide to buy back and then do the checks but it might look suspicious. Let me know on the plan and confirmation that we can inspect the containers arriving. Then we can decide to involve Citi or not.*"

55. At about the same time, there were WhatsApp exchanges between Mr Bhatia and Mr Gupta, in which Mr Bhatia said that he needed to know which containers could be inspected, as he needed to inform Geneva.

56. The MDR Defendants relied on these documents as showing that not only Mr Bhatia and Mr Oikonomou, but also Mr Barthelme and possibly others in Trafigura, knew that some containers did not contain nickel and were worried about how best to pacify Citi, without arousing suspicion.

57. Read in isolation, that particular email from Mr Barthelme in this way might be said to suggest this (although the implication of Mr Barthelme and Mr Wetterwald was surprising, their involvement not being supported by any other evidence and not having been alleged, either in the pleadings or in evidence, or raised in advance in the MDR Defendants' skeleton argument). However, the email naturally cannot be read in isolation.

58. Mr Oikonomou responded on the same day, as follows:

> "Hi Thibaut - we had a discussion with UIL on Friday and we agreed on the following:
> · Reduction plan to bring it to 22KT by Dec22 and below 20KT by March 23.
> · 20% of the new containers that are sold to us every month to be inspected by a surveyor like GS/AHK etc which we we appoint.
> · We are finalising today a list of containers that are in transhipment ports (approximately 20% of the total stock) that will be moved to a warehouse for immediate inspection.
> I will revert with more details on the last point once we have all the details. You think the above would be ok for Citi?"

59. This suggested that Mr Oikonomou had no particular concerns about having cargoes inspected, but was waiting for information from the MDR Defendants about which containers could be moved readily to LME warehouses (i.e., those currently in transhipment ports).

60. The exchanges that followed showed Mr Barthelme being in agreement with this and believing that the combination of reductions and inspections would satisfy Citi. It is apparent that discussions to accomplish this took place with the MDR Defendants over the next few days, resulting inter alia with the nomination of 20 initial containers (intended to be the beginning of a rolling inspection programme).

61. In the event, Mr Barthelme's optimism as regards Citi was misplaced. Despite being told about the planned reductions, and despite arrangements being made for a

programme of inspections, Citi nevertheless made the decision to stop financing this business. This happened on about 27 October 2022.

62. This meant that Trafigura was no longer any under pressure from Citi in relation to inspections. If those involved on the Trafigura side had known that the cargoes purchased from the MDR Defendants did not in fact consist of nickel, one might have expected that they therefore would no longer press for containers to be inspected.

63. On their side, the MDR Defendants indeed sought to "stall" the inspections, notably in an exchange between Mr Gupta and Mr Oikonomou on 7 November 2022. However, no-one on Trafigura's side was receptive to this. On the contrary, Mr Oikonomou responded to Mr Gupta by insisting on at least proceeding with the inspection of the 20 containers that had been arranged (by this point) two weeks earlier. These were the inspections that Trafigura carried out on 9 November 2022, in which none of the 20 relevant containers were found to contain nickel, and which led directly to Trafigura's investigation into the alleged fraud.

64. Accordingly, when looked at in context, it is difficult to read the email of 24 October 2022 from Mr Barthelme as an indication of knowledge on his part of the Arrangement. The more obvious reading is that when Mr Barthelme used the words "… if we find no materials", he was positing a hypothetical worst-case scenario. It was something he regarded as an abstract possibility, not something he knew would happen. Still less does the email indicate knowledge on the part of Mr Oikonomou, because Mr Oikonomou's response to the email and his subsequent conduct tends to suggest the opposite.

65. I therefore do not see the materials relied on by the MDR Defendants as providing any real support for their case, for the purposes of this application.

**Avoiding red flags**

66. Mr Howe KC suggested that Mr Bhatia (in particular) made various suggestions as to how the business should be arranged, with a view to avoiding red flags being raised by the Trade Finance Department or by Citi. The relevant documents in this regard dated mostly from 2019 and 2020, although some were later.

67. It is right that Mr Bhatia appears to have been concerned not to invite question from the Trade Finance Department, and at various points made suggestions about structuring the transactions so that they looked more like conventional trades – notably, by ensuring that cargo sold by one MDR Defendant would be repurchased by a different corporate entity (i.e., one of the other Defendants). Deflecting the attention of the Trade Finance Department may well have been wrong, but is not evidence that he knew that the material in the containers was not nickel.

68. Within most trading companies, there is frequently tension between traders, who are by nature deal-makers, and those responsible for internal restrictions on lending to purchasers, whom traders often regard as deal-blockers. The materials that the MDR Defendants relied on under this heading smacked of precisely this kind of internal tension, rather than knowledge of fraud.

**Extent of Trafigura's involvement in the orchestration of the transit financing arrangement**

69. The MDR Defendants relied on the fact that there were regular communications between them and Trafigura – in particular, Mr Rathi, Mr Bhatia and the traders in Mumbai (i.e., Mr Nair, Mr Sharma, Mr Buddabasaynor and Mr Jain). These communications descended to detailed instructions from Trafigura as to the operation of the transactions, including matters such as which email account should be used and what wording.

70. I accept that there were very frequent communications and that Mr Bhatia and those under him in Mumbai were closely involved. This is indicative of an unusually close relationship, in particular on the part of Mr Bhatia. However, that is the "cosiness" that Trafigura specifically dislosed to Foxton J. None of the materials shown to me under this heading indicated knowledge that the materials in the containers were not nickel.

**Conclusion on the evidence said to suggest that Mr Oikonomou, Mr Bhatia and the traders knew of the Arrangement**

71. The MDR Defendants said that there were strong grounds for believing that Mr Oikonomou, Mr Bhatia and/or the traders (i.e., Mr Nair, Mr Sharma, Mr Buddabasaynor and Mr Jain) knew of the Arrangement; possibly, others did as well. They said that this should have been apparent to Trafigura, and it therefore should have been drawn to the Court's attention. The fact that it was not drawn to the Court's attention means that Trafigura failed to make proper disclosure.

72. They also suggested that, in so far as Trafigura addressed the relevant evidential materials, it did so in a misleading manner; that Trafigura failed to disclose that the MDR Defendants might well have a substantial defence to the claim; and that Trafigura failed to disclose that Mr Oikonomou's evidence was suspect and could not be relied on. While formally different, these ways of putting the arguments on this application were all founded on the major premise of the primary argument, i.e. non-disclosure as summarised in the previous paragraph.

73. Thus, they all rested on the contention that there was, in fact evidence to suggest that Mr Oikonomou, Mr Bhatia and/or the traders knew of the Arrangement, such that this should have been apparent to Trafigura, and therefore should have been disclosed.

74. There was no real disagreement between the parties as to the duties on a party that seeks relief such as a WFO, without giving notice to the other side. I was reminded of the principles set out by Ralph Gibson LJ in *Brink's Mat Ltd v Elcombe* [1988] 1 WLR 1350 (at pp. 1356F-1357G). I was also taken to discussion of those principles in a number of subsequent cases that have emphasized (i) how important they are but also (ii) that sensible limits have to be drawn.

75. This is not a case where applying those principles, or finding their limits, is at all difficult. As I have explained above, I am not satisfied that the materials shown to me by Mr Howe KC should have put Trafigura on notice that there was a real possibility that Mr Oikonomou was involved in or knew about the alleged fraud. If relevant, I would say the same about Mr Bhatia and the traders working under him, but it is apparent that enough was said to Foxton J that he was in any event well aware of the

possibility that it might be said that Mr Bhatia knew about the Arrangement. Accordingly, there was no failure to disclose. The presentation made to Foxton J was fair, in all the circumstances.

## Overall conclusion and disposal

76. It follows that the application fails. I will wait for the parties' submissions on costs, but in the ordinary way they will follow the event.

77. I must re-emphasise my conclusion has no bearing on what will happen at trial. By that stage, the evidence available may present an entirely different picture.

78. I should also say that I heard very limited argument on what legal significance it would have, if it were to be established that Mr Oikonomou, Mr Bhatia and/or the traders knew of the Arrangement. The MDR Defendants' case is that this would mean that Trafigura knew, such that Trafigura would not be able to say that it had been deceived. Trafigura does not accept this, as Mr Pillow KC's submissions to me made clear, although Mr Pillow KC did not explore the authorities at great length – no doubt because he considered this unnecessary.

79. The presentation made to Foxton J made it clear (at paragraph 45.3 of the skeleton) that it would, if necessary, be said that the knowledge of a few individuals should not be treated as legally attributable to Trafigura. Foxton J did not ask for any assistance on that point, but I have no doubt that he was and is familiar with *Bowstead & Reynolds on Agency* (22nd ed.) Article 95, and with *Bilta (UK) Ltd v Nazir (No. 2)* [2016] AC 1. Because the submissions before me focussed on the facts more than on the law, I will not express a considered view. However, limb (4) of *Bowstead* Article 95 is a serious difficulty for the MDR Defendants.